STATE OF NEBRASKA, APPELLANT, V. SYLVESTER FRANK PETTIT,
APPELLEE.
417 N.W.2d 3

Filed December 18, 1987.    No. 87-516.

Joseph J. Divis, Blaine County Attorney, for appellant.

John O. Sennett and Brad Roth of Sennett & Roth, for appellee.

SHANAHAN, J.

Before trial and pursuant to Neb. Rev. Stat. § 29-115 (Reissue 1985), Sylvester Frank Pettit moved for suppression of his oral statements to law enforcement officers regarding a homicide which was later the basis of a manslaughter charge, Neb. Rev. Stat. § 28-305 (Reissue 1985). From the order of the district court for Blaine County, suppressing Pettit's statements, the State appeals. See Neb. Rev. Stat. § 29-116 (Reissue 1985).

### SUPPRESSION OF STATEMENTS

In the motion to suppress his statements to law enforcement officers, Pettit alleged that his statements were involuntary and were obtained in denial of Pettit's privilege against self-incrimination, contrary to the provisions of the Nebraska Constitution and the U.S. Constitution. See, Neb. Const. art. I, §§ 3 ("due process") and 12 (privilege against self-incrimination); U.S. Const. amends. V and XIV.

The State and Pettit agree that Pettit made the statements to law enforcement personnel during custodial interrogation governed by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

At the conclusion of the suppression hearing, the district court found that the State had failed to establish that Pettit waived the constitutional protection afforded by the privilege against self-incrimination.

### ASSIGNMENTS OF ERROR

The State contends that Pettit waived the privilege against self-incrimination consistent with the "*Miranda* warning" which must be given to a suspect subjected to custodial interrogation by police. The district court also found that the State failed to prove that Pettit's statements were voluntary, and the parties have devoted part of their arguments to Pettit's lucidity or acuity in reference to voluntariness of his statements, see *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985). However, even with the appellate assumption that Pettit possessed the faculty for voluntary statements, disposition of

the question concerning Pettit's waiver of the constitutional protection against self-incrimination disposes of the State's appeal and renders unnecessary any consideration of the other errors assigned by the State.

## STANDARD OF REVIEW

"In determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold the trial court's findings of fact unless those findings are clearly erroneous." *State v. Copple*, 224 Neb. 672, 689, 401 N.W.2d 141, 154 (1987). See, also, *State v. Vrtiska*, 225 Neb. 454, 406 N.W.2d 114 (1987).

"In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the Supreme Court recognizes the trial court as the 'trier of fact' and takes into consideration that the trial court has observed witnesses testifying regarding such motion to suppress." *State v. Dixon*, 222 Neb. 787, 795, 387 N.W.2d 682, 687 (1986). See, also, *State v. Copple, supra; State v. Vrtiska, supra*.

## EVIDENCE AT SUPPRESSION HEARING

Responding to a call about a shooting, Blaine County Sheriff Lee Sinner and members of the Nebraska State Patrol arrived at the Pettit residence shortly after midnight on January 16, 1987. Sheriff Sinner entered the Pettit house and found Frank Pettit, covered with blood, kneeling over the body of Pettit's wife, Pandora. The body, with a bullet wound to the chest, was lying in a pool of blood on the bedroom floor. Pettit was pressing his hand against the gunshot wound in the body and was attempting to place some plastic substance in the bullet hole. A .22-250 caliber rifle rested against the bedroom wall. When Sheriff Sinner asked what had happened, Pettit did not answer, but arose and went into the kitchen, where Pettit fainted. When Pettit regained consciousness, Trooper Carrolle E. Harris of the Nebraska State Patrol placed handcuffs on Pettit, who was then arrested by Sheriff Sinner and transported to the Custer County jail at Broken Bow, because there was no jail in Blaine County.

Shortly after 2 a.m., a jailer obtained general information from Pettit's driver's license and observed that Pettit was "in shock or not comprehending anything, not talking." At 7:10

a.m. on the morning of January 16, Trooper Harris removed Pettit from his cell and took him to an interrogation room in the jail. Present in that room during Pettit's interrogation were Trooper Harris, Sheriff Sinner, Investigator Terry Ahrens of the Nebraska State Patrol, and a Sergeant Elliott of the Nebraska State Patrol. Sheriff Sinner, Trooper Harris, and Sergeant Elliott jointly participated in Pettit's interrogation. According to Trooper Harris, Pettit was "clear and understandable" at this time, and Sheriff Sinner indicated that Pettit "appeared to understand all the questions" during the interview.

Trooper Harris presented Pettit with a form entitled "ADVICE OF RIGHTS," utilized by the Nebraska State Patrol, which contained:

> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer before answering any questions and to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you at no cost before any questioning.
>
> If you answer questions now without a lawyer present, you have the right to stop answering at any time until you talk to a lawyer.
>
> \* \* \* \* \*
>
> I have read the above statement of my rights. I understand my rights and I am willing to answer questions at this time without the services of a lawyer. I will answer questions freely, voluntarily and of my own free will. I do so without being under duress, coercion or threats, and without having been promised any leniency or immunity.

Trooper Harris read the "rights" form to Pettit, who declined to sign that document. Sergeant Elliott then commenced the interrogation, which was tape-recorded and later transcribed as "INTERVIEW OF SYLVESTER FRANK PETTIT, SUSPECT." The transcription was identified as exhibit 1 for the suppression hearing and was received into evidence.

After preliminary questions about identification of Pettit as the person being interrogated, the following evolved during

Pettit's interrogation:

Elliott: . . . okay Frank we need to ask you some questions about our, the accident tonight, but before we ask you the questions about the shooting, ah I need to read you some rights, do you understand me, I need to know you are hearing me Frank, please answer me, would you, can you hold your head up a little bit, I didn't hear ya

Pettit: Ya

Elliott: Okay, pause, you have the right to remain silent Frank, do you understand that, can you answer me Frank I can't hear ya

Pettit: Ya

Elliott: Okay, anything you say can be used against you in court, you have the right to talk to a lawyer before answering any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you at no cost before answering any questioning, if you answer questions now without a lawyer present you have the right to stop answering at any time until you talk to a lawyer. You . . . understand your rights in this matter? Okay Frank there's been a terrible accident tonight, and we need to get it resolved, we, we, we, you, I and this officer we need to get the facts down so that it's just exactly what happened, is determined so that it is fully understood, ah, pause, ah your your wife even made the statement that, that was an accidental shooting, ah, pause, what, what, what brought it about to you guys went out to do a little bit of drinking as I understand, right

Pettit: Ya

Elliott: Oh, can you fill me in from that point, we see your car along side of the road, ah what happened to the car

Pettit: Ran out of gas

Elliott: Ran out of, bummer, did you walk on into ah Halsey from there or did you just go back home

Pettit: Walked north

Elliott: Pardon me, I didn't hear ya Frank

Pettit: Walked home

Elliott: Walked home, pause, what happened when you

got home, ah did you and your wife get into a little bit of a flight [sic] or or what happened when you got home, that's the part we need to talk about, what happened at home Frank, pause, did you guys get into a fight, pause, Frank did you hear me, pause Frank let me know if you're hearing me please, Frank

Pettit: Huh

Elliott: What happened when you got home with your wife tonight, pause, with the gun, did you, you just, were we talking, we were talking about the gun, were we going to sell the gun or we're going hunting, what, how did the gun get out, pause, Frank talk to me Frank, help us get this squared away so we, so the county attorney, and everyone don't think the wrong things going on here, there's no point in you suffering any more than you need to suffer, you've lost your wife already through an accident, now let's get it all out on the table, so we can get it all cleared up, it's not gonna make it any better if we have to drag this thing through alot of a lovely court hearing because its an accident, let's get it opened up, pause, do you hear me Frank, talk to me help me get this squared away, Frank are you with me,

Harris: Frank do you want to talk to us, pause, come on we need your help

Pettit: No (faint)

Elliott: No what Frank, pause

Harris: Tell us what happened

Elliott: Frank, look up, look up, Frank, let me know you're at least hearing this, that we're not talking to nobody, are you alright Frank, pause, Frank talk to me

Sinner: You don't care if I speak to him do you

Elliott: Go ahead

The officers immediately continued the interrogation and obtained Pettit's answers to a series of leading questions, which indicated or suggested details concerning Pandora's death, including a quarrel between Pandora and Pettit in their home shortly before the shooting, involvement of the rifle found in the Pettit bedroom, and a struggle between Pettit and Pandora. Such questioning included:

224

Harris: Tell us what happened then Frank, so we know what happened, look up here Frank hey Frank look up here at me

Sinner: Frank ole boy, Frank, look over there at those there guys there just a minute

Harris: Tell us what happened Frank

Elliott: You don't want to tell us what happened

Elliott to Harris: Go ahead, he was talking to you go ahead

Harris: Frank, you went in the bedroom and you picked the gun up from behind the door, right is that right. Frank look at me a minute hey Frank look up here, I want to help you Frank, look up here, tell me what happened, you went in, you picked the gun up from behind the door, right or is that wrong, Frank, you picked it up, sat down on the bed with it, did you put a round in it, Frank or did it already have the round in it, Frank, Frank, look at me Frank, Frank, he, Frank look up here at me, would ya, talk to me, don't you want to talk to me no more would you talk to the other guys if I leave, would you talk to me if they leave

Elliott: Are you done talking to us Frank, Frank before we leave, understand that as of right now, it looks like a murder in the first degree, because you went into the bedroom, you got a gun you loaded the gun and she walked in and you wasted her that's brutal, but that's the way it is, now if it's a mistake if it's wrong, then let's get the facts out on the table, let's present them like it should be if it's an accident, let's talk about it, let's make it as an accident, but this sitting here and not answering questions and not talking to us, acting like you don't hear us isn't doing nothing but hurting you because as it is, you're dead you, you, you're cooked, we got your fingerprints all over the gun, we got you telling us you went into the bedroom and loaded it

Sinner: You better give 'em your facts

Elliott: Right now, it's murder one

Sinner: Frank

Elliott: Because you went in there with premeditation of shooting her

Harris: Talk to us Frank tell us what really happened

Elliott: That's let's find out what really happened so we can eliminate that, if that's not right let's get it out of there, but that's the possibility right now, it's big time, we're not talking small stuff here, this isn't a traffic court, this isn't a bad check

Sinner: If there's a big fussan [sic], and you think there's any chance of an accident or anything, well we want you to tell us

Elliott: If it happened during a fight, between you, you and Bambi that eliminates murder one and if would cooperate with us and tell us about it, it might be easier for a judge to believe it was an accident, but as long as you sit here and play games with us, it starts to look like an accident, it starts to look like you're trying covering something up. Now we already know you had a fight, you want to cooperate with us Frank, or do you want to play the game some more.

Pettit: I want to talk to a lawyer

Elliott: Okay, thank you for you [sic] time Frank

INTERVIEW ENDED

The State argues that Pettit's waiver of his right to remain silent or the privilege against self-incrimination is found in his responses, "Ya," made after Sergeant Elliott's comments containing reference to Pettit's "rights" pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

CUSTODIAL INTERROGATION AND *MIRANDA*

In *Miranda v. Arizona, supra,* and to counter potentially coercive circumstances surrounding a suspect's statement to police officers, the U.S. Supreme Court formulated prerequisites for admissibility of a suspect's in-custody statement(s) obtained "in a police-dominated atmosphere, resulting in self-incriminating statements," 384 U.S. at 445, namely, the "*Miranda* warning," by which law enforcement personnel must inform the person in custody "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. The *Miranda* Court continued:

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked,

384 U.S. at 473-74, and,

If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. [Citation omitted.] This Court has always set high standards of proof for the waiver of constitutional rights [citation omitted] . . . .

384 U.S. at 475.

Finally, the Court in *Miranda* concluded that the "*Miranda* warning" serves as a means "to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . ." 384 U.S. at 479.

In considering admissibility of a defendant's statement made after invocation of the right to remain silent or the privilege against self-incrimination, this court, in *State v. Teater*, 209 Neb. 127, 131-33, 306 N.W.2d 596, 599 (1981), stated:

This court has previously set out the *Miranda*-imposed requirements on police officers when a suspect invokes his constitutional right to remain silent and his right to counsel. In *State v. Fuller*, 203 Neb. 233, 238-39, 278 N.W.2d 756, 759-60 (1979), this court said: "Although Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), does not require an absolute halt to all conversations by the police with the defendant once the right to silence is asserted, observance of the

constitutional right is tested by the circumstances to determine whether the right was 'scrupulously honored.'..

"Recent cases consider the validity of a subsequent waiver of the once-asserted right to counsel under certain circumstances. [Citations omitted.] These cases hold that the defendant cannot be persuaded to waive his rights and there is a strong presumption against waiver. 'If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' [Citing *Miranda v. Arizona.*]"

In *In re Interest of Durand*, 206 Neb. 415, 293 N.W.2d 383 (1980), this court said: "Once *Miranda* warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."

. . . . The evidence is undisputed that the defendant's assertion of his constitutional right to remain silent and right to counsel was not "scrupulously honored." The evidence was insufficient, as a matter of law, to meet the heavy burden resting on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. The motion to suppress should have been granted.

More recently, in *State v. LaChappell*, 222 Neb. 112, 118-19, 382 N.W.2d 343, 348 (1986), we stated:

Once an individual in custody indicates in any manner, at any time prior to or during questioning, that he or she wishes to remain silent, interrogation must cease, for at this point the individual being interrogated has shown that he or she intends to exercise his or her fifth amendment right to remain silent. [Citations omitted.] Moreover, once the right to remain silent has been invoked, there is a

strong presumption against its subsequent waiver. See, also, *State v. Joy*, 218 Neb. 310, 353 N.W.2d 23 (1984).

## CONTINUED QUESTIONING AFTER INVOCATION OF *MIRANDA*

After *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court decided *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), which involved admissibility of Mosley's statement made after he had expressed his unwillingness to answer police questions about robberies under investigation. Approximately 2 hours after indicating that he wished to remain silent, Mosley was questioned about a homicide, an occurrence unrelated to the robberies which were the subject of Mosley's initial interrogation. A police officer who had not participated in Mosley's initial interrogation advised Mosley of the "*Miranda* rights," and Mosley then made a statement implicating himself in the homicide. In the course of its opinion in *Mosley*, the U.S. Supreme Court reviewed certain language in *Miranda v. Arizona, supra*, and stated:

The issue in this case . . . is whether the conduct of the Detroit police that led to Mosley's incriminating statement did in fact violate the *Miranda* "guidelines," so as to render the statement inadmissible in evidence against Mosley at his trial. Resolution of the question turns almost entirely on the interpretation of a single passage in the *Miranda* opinion, upon which the Michigan appellate court relied in finding a *per se* violation of *Miranda*:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U. S., at 473-474.

This passage states that "the interrogation must cease" when the person in custody indicates that "he wishes to remain silent." It does not state under what circumstances, if any, a resumption of questioning is permissible. The passage could be literally read to mean that a person who has invoked his "right to silence" can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Another possible construction of the passage would characterize "any statement taken after the person invokes his privilege" as "the product of compulsion" and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite.

. . . Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

. . . Through the exercise of [a person's] option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

423 U.S. at 100-04.

In *Mosley*, the Court noted that after Mosley had invoked his right to remain silent, there was a 2-hour interval before resumption of questioning and that "[t]he subsequent questioning did not undercut Mosley's previous decision not to

answer [police] inquiries." *Michigan v. Mosley*, 423 U.S. 96, 105, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). The Court then concluded:

> This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.

423 U.S. at 105-06.

The U.S. Supreme Court, in *Michigan v. Mosley*, 423 U.S. at 104, held that the circumstances demonstrated that Mosley's " 'right to cut off questioning' " was " 'scrupulously honored' " in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Thus, in view of *Michigan v. Mosley, supra*, after a defendant has invoked the right to be silent and terminate custodial interrogation by police, but there is subsequent police interrogation of the defendant, a court considers three factors to determine whether a defendant's right to be silent has been scrupulously honored, namely: (1) Did the police immediately cease interrogation on the defendant's request? (2) Did the police resume an interrogation of the defendant only after passage of a significant time and a renewal of the *Miranda* warning? and (3) Did police restrict the subsequent interrogation to a transaction or occurrence which was not the subject of the prior interrogation which was discontinued? See, *State v. Hartwig*, 123 Wis. 2d 278, 366 N.W.2d 866 (1985); *Jackson v. Wyrick*, 730 F.2d 1177 (8th Cir. 1984).

A waiver must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the

background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938).

An accused may waive the privilege against self-incrimination or the right to remain silent, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. at 444.

In view of Sergeant Elliott's expression of the *Miranda* warning and the ensuing multiple questions directed to Pettit, the responses, "Ya," are equivocal and ambiguous. On the one hand, there were the officers' questions: "[Y]ou have the right to remain silent Frank, do you understand that . . . ?" and "You . . . .understand your rights in this matter?" On the other hand, there may be the paraphrased inquiry: "Although you do have the right to remain silent, Frank, will you answer my questions?"

A person's mere acknowledgment or recognition of the constitutional right to remain silent and the privilege against self-incrimination does not constitute a waiver of the constitutional protection. As the U.S. Supreme Court noted in *Miranda v. Arizona*, there are "high standards of proof for the waiver of constitutional rights." 384 U.S. at 475. Equivocality and ambiguity do not provide requisite proof that a person has waived a constitutional right.

What is certain and not the least bit equivocal or ambiguous is the following, during Pettit's interrogation: "Harris: Frank do you want to talk to us? . . . [C]ome on we need your help. Pettit: No." At that point Pettit invoked his constitutional right to remain silent and terminate the interrogation in accordance with his privilege against self-incrimination. Nevertheless, there was no cessation or termination of Pettit's interrogation. After commencement, the interrogation continued until terminated on Pettit's request for an attorney, notwithstanding Pettit's manifest indication that he did not want to talk with the officers, that is, answer their questions about Pandora's death. As the U.S. Supreme Court very emphatically stated in *Miranda v. Arizona*, 384 U.S. 436, 473-74, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966):

If the individual indicates in any manner, at any time prior

to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

When the factors indicated in *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), are applied in the present case, the officers' continuation in questioning Pettit, immediately after Pettit's invocation of the right to be silent and terminate the interrogation, warrants the conclusion that Pettit's right to remain silent was not "scrupulously honored." The nature of evidence presented to the district court is such that the court could and did find that Pettit did not waive his privilege against self-incrimination and his right to remain silent, and supports a finding that the State failed to meet its "heavy burden . . . to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination . . . ." *Miranda v. Arizona*, 384 U.S. at 475. After Pettit's invocation of his right to be silent, there is no evidence on which a waiver of that right might be predicated.

The district court's finding on waiver is not clearly erroneous. Consequently, the district court's order suppressing Pettit's statements reflected in exhibit 1, the transcribed interview, is affirmed.

AFFIRMED.