IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

STATE V. CHILEN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,
V.
ALLEN D. CHILEN, APPELLANT.

Filed September 16, 2014.    No. A-13-1099.

Appeal from the District Court for Lancaster County: ROBERT R. OTTE, Judge. Affirmed.

Dennis R. Keefe, Lancaster County Public Defender, and Shawn Elliott for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

IRWIN, MOORE, and PIRTLE, Judges.

MOORE, Judge.

## I. INTRODUCTION

Allen D. Chilen appeals from his conviction following a jury trial in the district court for Lancaster County for first degree assault and driving during revocation. The court sentenced Chilen to prison for 10 to 15 years' imprisonment for the assault conviction and to a consecutive sentence of 1 to 3 years' imprisonment for the driving during revocation conviction. On appeal, Chilen assigns error to the court's failure to sever the two charges for trial, to declare a mistrial, and to direct a verdict on the assault charge. He also asserts that the court imposed excessive sentences and that he was denied effective assistance of trial counsel in various regards. We find no abuse of discretion in the district court's decisions with regard to the motion to sever the charges, the motion for mistrial, the motion for directed verdict on the assault charge, and with respect to the sentences imposed. Because the record is insufficient to review Chilen's allegations of ineffective assistance of counsel, we do not reach those claims in this direct appeal.

## II. BACKGROUND

### 1. INFORMATION AND PRETRIAL PROCEEDINGS

On Ju1y 3, 2013, the State filed an information in the district court, charging Chilen with first degree assault in violation of Neb. Rev. Stat. § 28-308 (Cum. Supp. 2012), a Class II felony, and driving during revocation, first offense, in violation of Neb. Rev. Stat. § 60-6,197.06 (Reissue 2010), a Class IV felony. Specifically, the State alleged that on or about April 28, 2013, Chilen intentionally or knowingly caused serious bodily injury to John Card and operated a motor vehicle while his operator's license had been revoked.

On October 9, 2013, Chilen orally moved to sever the two counts for trial, asserting unfair prejudice would result if the charges were tried together. The State argued that the two charges were properly joined as they were factually interconnected. The court denied Chilen's motion, finding that the res gestae of the crimes were sufficiently interlinked and that there would not be any unfair prejudice in having the jury consider both charges.

On October 15, 2013, prior to the start of trial, the district court held a *Jackson v. Denno* hearing regarding Chilen's statement to the police. See *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). The State presented testimony from Sgt. Philip Lang of the Lancaster County Sheriff's Department. Lang testified about his involvement in the arrest and subsequent police interview of Chilen. Following Lang's testimony, the court reserved ruling until the second officer who interviewed Chilen was available to testify. Near the end of the trial, the *Jackson v. Denno* hearing resumed with testimony from Officer Curtis Reha of the Lancaster County Sheriff's Department. Reha was present when Chilen was arrested, and he transported Chilen to the sheriff's office. Reha testified that no threat, promise, or coercion was used to get Chilen to talk to police during the transport. At the sheriff's office, Reha advised Chilen of his *Miranda* rights. Reha testified that he made no threats or promises to get Chilen to sign the waiver form and that Chilen's responses during the advisement seemed appropriate. The court received the *Miranda* form signed by Chilen and a DVD of the police interview into evidence. The court found that Chilen's statements to the police were made freely, voluntarily, knowingly, and intelligently.

Also, prior to the start of trial and prior to the district court's ruling on the *Jackson v. Denno* hearing, Chilen's counsel made two oral motions in limine in the event the court ruled that Chilen's statement to police was admissible. Chilen's counsel objected to a reference in the police interview to a hearsay statement from "a guy named Chuck" and objected to a reference to Chilen's child support obligation as not relevant and unfairly prejudicial. The court sustained the motions in limine. Later, during the trial, the prosecutor informed the court that the video of the interview had been redacted pursuant to the court's order, and Chilen's counsel stated that he was satisfied with the redaction.

### 2. JURY TRIAL

A jury trial was held before the district court on October 15 through 18, 2013. The court heard testimony from various witnesses, including Chilen and Card, and received exhibits, including numerous photographs of the crime scene and Card's injuries and a DVD of Chilen's police interview.

(a) Undisputed Events of
April 27 and 28, 2013

Chilen and Card both testified about the events in question and their testimony reflects certain undisputed facts with respect to what happened on April 27 and 28, 2013. Chilen and Card are stepbrothers, and at that time, they lived together in a trailer home in Martell, Nebraska. Chilen and Card also worked together in construction. Card is 10 years older than Chilen, and at the time of the assault, Card weighed substantially less than Chilen.

On Saturday, April 27, 2013, Chilen and Card worked on a garage in Crete, Nebraska. They left the worksite together at approximately 3 p.m. and returned to the trailer in Martell, where they drank some beer. Eventually, they went to an individual's house in Lincoln, Nebraska, where both Chilen and Card smoked "K2."

After leaving Lincoln, Chilen and Card stopped at CJ's Paintball. At some point, Card drove away from CJ's Paintball, leaving Chilen behind, and returned to the trailer. From this point in the evening onward, Chilen's and Card's recitation of events differs.

(b) Card's Testimony

Card's testimony reflects that Chilen drove them to and from work on April 27, 2013, and continued to drive up until Card took the vehicle and left Chilen behind at CJ's Paintball.

With respect to the assault, Card testified that after leaving Chilen behind at CJ's Paintball and returning to the trailer, he fell asleep in the living room on a couch that he used as a bed. The next thing Card remembers is waking to find Chilen on top of him, hitting him in the face. Card testified that Chilen struck him more than once with a closed fist, but he could not remember how many times Chilen struck him while they were on the couch. Card testified that Chilen also kicked or kneed him in the groin. Card was sheltering his face and never had a chance to hit Chilen. According to Card, Chilen was angry because Card "stole [his] Blazer" in front of his friends and called him "a bitch" all the time. Card remembers sitting up on the couch and noticing that his nose was bleeding and that a lot of hair had been pulled from his head.

Because his nose was bleeding, Card left the couch and went into the bathroom, but Chilen followed him. According to Card, Chilen then tried to shove him into the shower, but because Card resisted, he ended up seated on the toilet. Chilen grabbed Card by the hair with one hand and continued to hit Card, ripping out more hair and striking him at least 15 times on his face and head. Chilen also kicked or kneed him again. Chilen kept asking, "[A]m I your bitch now, am I your bitch?"

According to Card, the entire assault lasted approximately 20 to 30 minutes. He testified that the portion of the assault that took place in the bathroom lasted about 10 minutes and ended when one of Chilen's dogs bit Chilen, at which point, Chilen grabbed the dog and started kicking it. Chilen then returned to the bathroom and took some pictures of Card with his cell phone. When Card left the bathroom, he looked for Chilen and noticed that the vehicle Chilen had been driving earlier was gone. Card left the trailer around midnight, went to the nearby home of his niece, and asked her to dial the 911 emergency dispatch service. Card testified that he was in a lot of pain, had blood all over his face, and was having difficulty breathing. After law enforcement and medical personnel arrived, Card was taken to a hospital in Lincoln.

### (c) Medical Evidence

Dr. Reginald Burton testified when Card was brought to the emergency room on April 28, 2013, he was evaluated with a CAT scan of his head, cervical spine, and facial bones. The medical testing showed fractures of Card's nasal bones, maxilla (cheekbone), pterygoid bone (bone behind the cheekbone), and left mandible (jawbone). Subsequent followup x rays showed a fracture of Card's pelvis. Card also suffered multiple contusions and scrapes. Medical testing did not establish any fracture of Card's ribs, but Burton testified that Card had some bruising of the chest wall or "clinical rib fractures," which are often too small to show up on x rays. Burton testified that fractures to nasal bones and cheekbones can result in breathing and sinus problems. According to Burton, because of its location, significant force would have been required to fracture Card's pterygoid bone. Jawbone fractures carry a risk of infection and less than optimal nutrition during the healing process. The displacement of Card's jawbone was not significant enough to require surgery, but he was placed on a liquid diet for 6 to 8 weeks. Card was also restricted from lifting more than 8 to 10 pounds for a period.

According to Card, in addition to the injuries noted by Burton, a part of his ear was missing as a result of the assault. He was given medication for his pain and antibiotics because of the five hairline fractures in his jaw. Card testified that his ribs were sore for at least 6 weeks. Following the assault, Card also noticed memory loss and blurry vision in his left eye. At trial, Card testified that he continues to have periodic blurry vision in his left eye and a loss of hearing, numbness, and occasional ringing in his left ear. Card was evaluated for posttraumatic stress following the assault, and he testified that he continues to have problems with sleep and still experiences flashbacks to the assault.

With respect to his memory of the evening in question, Card testified that his memory is good up to the point where he and Chilen went to the individual's house in Lincoln. Card admitted that after they left that individual's house, there are things he does not remember. He does not remember going to the house of an individual named "E," nor does he remember falling down at that individual's house. He agreed that it was possible he and Chilen went to the house, but he testified that he would have remembered receiving injuries from falling down.

### (d) Other Witnesses

Two of the State's witnesses recalled seeing Chilen at CJ's Paintball on the evening in question. Both witnesses observed Chilen receive a ride away from CJ's Paintball, drive himself back sometime later, and then run off when a sheriff's deputy pulled into the parking lot. One of the witnesses testified that after returning to CJ's Paintball, Chilen showed him some pictures on his cell phone that appeared to depict Card and the aftermath of an assault. According to this witness, Chilen had fresh cuts and scrapes on his hands when he returned.

### (e) Law Enforcement Investigation

Deputy Jason Mayo of the Lancaster County Sheriff's Department was dispatched to the trailer in Martell shortly before 2 a.m. on April 28, 2013. When he arrived at the scene, Mayo spoke to Card, who was bloody, disheveled, moaning, and in obvious pain. In the trailer, Mayo did not notice any blood or hair near the couch, but he did observe blood and hair in the bathroom. Chilen was eventually arrested and transported to the sheriff's office, where he was

interviewed by Reha and Lang. After Reha read Chilen his *Miranda* rights, Chilen signed the *Miranda* form and agreed to make a partial statement. The district court received the DVD of the recorded interview into evidence without objection from Chilen's trial counsel, and the recording was played for the jury.

### (f) Chilen's Police Interview

We have limited our recitation of Chilen's police interview to those details relevant to his assignments of error on appeal. In Chilen's recorded statement, following the *Miranda* advisement, he was asked if he would make a statement, to which Chilen replied that he was willing to make a partial statement. During the interview, the officers asked Chilen four times if he had been driving. Chilen did not answer those questions, stating that he would rather not say. Near the end of the interview, Chilen asserted his Fifth Amendment right not to answer questions about whether he had been driving.

### (g) Stipulation and State Rest

After the conclusion of Reha's testimony, the parties stipulated that on or about April 28, 2013, Chilen's operator's license was revoked, he was under a court order not to operate any motor vehicle for any purpose, and he did not have an ignition interlock permit. Chilen's attorney noted that his agreement to the stipulation was subject to his motion to sever the counts. Thereafter, the State rested, and the district court denied Chilen's motion to dismiss the assault charge.

### (h) Advisement Regarding Right to Remain Silent

Prior to the close of the State's case, Chilen's counsel informed the district court that Chilen might testify. The court advised Chilen it was his right to testify and that he had the right to remain silent which could not be used against him. The court explained that it would give a jury instruction that Chilen's silence could not be used against him but that if he did testify, he would be waiving his right to silence, that he would be subject to cross-examination, and that there would not be any such jury instruction. The court also explained that Chilen's prior felony conviction could be used to impeach him. The court told Chilen to further discuss the matter of testifying with his attorney.

The following day, the district court inquired whether Chilen had determined whether he would be testifying. When Chilen's counsel informed the court that Chilen had not yet made that determination, the court again advised Chilen regarding his right to remain silent and the consequences if he chose to testify. Chilen acknowledged that he understood his rights. Chilen stated that it was "[c]rystal" clear to him that if he took the stand, he would be waiving his right to remain silent.

Just before Chilen took the stand and testified in his own defense, the district court questioned him yet again and established that Chilen understood he was waiving his right to remain silent by taking the stand and answering the first question, that he had discussed doing so with his counsel, and that he was freely and voluntarily waiving that right.

### (i) Defense Case/Chilen's Testimony

Chilen admitted that he was driving on April 27, 2013, and knew his license was revoked. He testified that at some point after Card left him at CJ's Paintball, the owner of that business drove him back to the trailer. According to Chilen, when he entered the trailer, he found Card lying on the couch, awake. Chilen raised his voice and asked Card several times why he had left CJ's Paintball without him. Chilen denied hitting Card with a closed fist while he was on the couch but admitted that he slapped Card's mouth with an open hand after Card told him to "shut up, bitch." According to Chilen, Card looked surprised and then got up from the couch and went into the bathroom. Chilen denied having any other physical contact with Card prior to when Card entered the bathroom.

Chilen testified that he grabbed his cell phone and went into the bathroom, intending to take a video of Card. Chilen accidentally took still pictures of Card instead. When Chilen entered the bathroom, he observed that Card was urinating. After Chilen took a picture, Card turned to him and made a vulgar inquiry, to which Chilen replied, "[T]hat will never happen again." Chilen testified that he then hit Card "pretty square" on the nose. Chilen testified that Card buckled from the blow and ended up seated on the toilet. Chilen denied kicking Card but recalled that at some point, he did try to knee Card and ended up striking Card with his thigh instead. Chilen testified that he was yelling at Card and asked him, "[A]m I your bitch now?" He also admitted that he had Card by the hair and that he pulled out some of Card's hair. Card was bleeding from his mouth and nose. Chilen denied hitting or kicking Card in the ribs, taking "a chunk out of [Card's] ear," or attempting to push Card into the shower.

Chilen agreed that one of the dogs bit or nipped him, but he did not recall hitting the dog. He testified that he left the bathroom to "gather" the dogs to keep them from hurting Card or tracking blood around the trailer, after which he returned to the bathroom and took an additional picture of Card. Chilen estimated that the incident in the bathroom lasted less than 1 minute. Chilen admitted that he was not proud of his actions and that he left the trailer to let Card clean himself up. After leaving the trailer, Chilen testified that he drove back to CJ's Paintball and stayed there awhile, consuming more alcohol.

Chilen denied that he caused any significant injury to Card. He attributed Card's injuries to an incident that happened before the assault in the trailer. According to Chilen, he and Card stopped at the house of the individual named "E" prior to returning to the trailer in Martell. According to Chilen, Card became very intoxicated and began to fall down. Chilen testified that while on the porch at the house, Card fell face first into a rockpile. Chilen testified that Card suffered at least a bloody nose from the fall and some pain and that Chilen even asked him if he wanted to go to a hospital. Chilen admitted that there were longstanding issues between him and Card. He also admitted that he had been convicted of a felony in the previous 10 years.

At the conclusion of Chilen's testimony, the defense rested, and the district court denied Chilen's motion for a directed verdict.

### 3. VERDICT AND JUDGMENT

On October 18, 2013, the jury returned a verdict of guilty on both felony counts. The district court accepted the verdicts; entered judgment, accordingly; and ordered a presentence investigation.

## 4. SENTENCING

On November 19, 2013, following a sentencing hearing, the district court entered an order, sentencing Chilen to prison for 10 to 15 years on his conviction for first degree assault and to a consecutive term of 1 to 3 years on his conviction for driving during revocation. The court also ordered Chilen not to drive for 15 years from the date of his release and revoked his operator's license for the same period. Chilen subsequently perfected his appeal to this court.

## III. ASSIGNMENTS OF ERROR

Chilen asserts that the district court erred in (1) failing to grant his motion to sever the two counts for trial, (2) failing to declare a mistrial, and (3) failing to direct a verdict on the assault charge. He also asserts that he received ineffective assistance of trial counsel in various regards and that the court imposed excessive sentences.

## IV. STANDARD OF REVIEW

A motion for a separate trial is addressed to the sound discretion of the trial court, and its ruling on such motion will not be disturbed in the absence of a showing of an abuse of discretion. *State v. Schroeder*, 279 Neb. 199, 777 N.W.2d 793 (2010). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State v. Berney*, 288 Neb. 377, 847 N.W.2d 732 (2014).

Whether to grant a mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion. *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014).

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Collins*, 281 Neb. 927, 799 N.W.2d 693 (2011).

The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014). The determining factor is whether the record is sufficient to adequately review the question. *Id.* An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Berney, supra.*

## V. ANALYSIS

### 1. MOTION TO SEVER

Chilen asserts that the district court erred in failing to grant his motion to sever the two counts for trial. Severance is not a matter of right, and a ruling of the trial court with regard

thereto will not be disturbed on appeal absent a showing of prejudice to the defendant. *State v. Hilding*, 278 Neb. 115, 769 N.W.2d 326 (2009). Neb. Rev. Stat. § 29-2002 (Reissue 2008) provides:

(1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(2) The court may order two or more indictments, informations, or complaints, or any combination thereof, to be tried together if the offenses could have been joined in a single indictment, information, or complaint or if the defendants, if there is more than one, are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. The procedure shall be the same as if the prosecution were under such single indictment, information, or complaint.

(3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint or by such joinder of offenses in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.

The district court denied Chilen's motion to sever the assault and driving during revocation charges, finding that the res gestae of the crimes were sufficiently interlinked and that there would not be any unfair prejudice in having the jury consider both charges. In place of the term "res gestae" evidence, some courts have substituted phrases such as "same transaction evidence" or "complete story principle." *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006), *cert. denied* 549 U.S. 1283, 127 S. Ct. 1815, 167 L. Ed. 2d 326 (2007). "Such evidence is often referred to as 'intrinsic evidence.' Evidence in this category 'is admissible for the purpose of providing the context in which the crime occurred.' [Citation omitted.]" *Id.* at 713-14, 715 N.W.2d at 549. Where evidence of other crimes is so blended or connected with the ones on trial so that proof of one incidentally involves the others, or explains the circumstances, or tends logically to prove any element of the crime charged, it is admissible as an integral part of the immediate context of the crime charged. *Id.*

In this case, part of Chilen's motive for the assault was his anger about Card's taking the vehicle Chilen had been driving, leaving Chilen behind, and embarrassing him in front of his friends at CJ's Paintball. The actions of both Chilen and Card, including the fact that Chilen drove the vehicle to various places prior to the assault, were part of the complete story of what led to the assault. Chilen is not entitled to severance as a matter of right, and the district court did not abuse its discretion in denying his motion. This assignment of error is without merit.

## 2. MISTRIAL

Chilen asserts that the district court erred in failing to declare a mistrial. Specifically, he argues that the court should have declared a mistrial when the jury heard that he was only willing to make a partial statement to law enforcement, that he refused to answer certain questions posed to him, and that he then asserted his right to remain silent.

- 8 -

A mistrial may be warranted where unfairness has been injected into a jury trial and so permeates the proceedings that no amount of admonition to the jury can remove the unfairness to a party. *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989). Prosecutors are charged with the duty of conducting criminal trials in such a manner that an accused may have a fair trial. *Id.* A prosecutor's comment on a defendant's silence in the defendant's trial is a violation of an accused's right to remain silent under the 5th and 14th Amendments to the U.S. Constitution and under article I, § 12, of the Nebraska Constitution. *State v. Pierce, supra.* An accused's right to remain silent at trial, accorded by the 5th and 14th Amendments to the U.S. Constitution and article I, § 12, of the Nebraska Constitution, is not limited to a statement concerning a defendant's failure to testify at trial, but includes the prosecutor's use of any language or device which compels a defendant to testify. *State v. Pierce, supra.*

While the State adduced some evidence concerning Chilen's invocation of his right to remain silent when asked by law enforcement if he had been driving on the night in question, Chilen's counsel did not object to the introduction of this evidence. The failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Foster*, 286 Neb. 826, 839 N.W.2d 783 (2013). One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *State v. Nadeem*, 284 Neb. 513, 822 N.W.2d 372 (2012). An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013). Chilen has not preserved this issue for appellate review.

### 3. DIRECTED VERDICT

Chilen asserts that the district court erred in failing to direct a verdict on the assault charge. Specifically, he argues that there was insufficient evidence that his actions resulted in Card being exposed to serious bodily injury.

Section 28-308 provides that "[a] person commits the offense of assault in the first degree if he or she intentionally or knowingly causes serious bodily injury to another person." Neb. Rev. Stat. § 28-109(20) (Reissue 2008) defines "[s]erious bodily injury" as "bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body."

Card testified that following the assault by Chilen, he suffered from contusions and a concussion, that he had five hairline fractures in his jaw, and that part of his ear was missing. Burton testified that Card suffered fractures of various facial bones and his jawbone; that he had a fractured pelvis; and that he had clinical rib fractures. Burton testified further to risks which could result from Card's injuries, including pneumonia, breathing problems, blood clots, and infection. Card was treated with pain medication and antibiotics, placed on a liquid diet, and given lifting restrictions for a period. Following the assault, Card experienced memory loss, blurry vision, sleep issues, and flashbacks. At the time of trial, he continued to have periodic blurry vision as well as hearing and other issues with his left ear. The evidence was sufficient to support a finding that Chilen intentionally or knowingly caused serious bodily injury to Card. The district court did not err in failing to grant Chilen's motion for directed verdict. This assignment of error is without merit.

## 4. INEFFECTIVE ASSISTANCE OF COUNSEL

Chilen asserts that he received ineffective assistance of trial counsel in various regards. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014). The determining factor is whether the record is sufficient to adequately review the question. *Id.* An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing. *Id.* In the context of a direct appeal, like the requirement in postconviction proceedings, mere conclusions of fact or law are not sufficient to allege ineffective assistance of counsel. *Id.*

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Filholm, supra*. An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order. *Id.* An appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel when raising an ineffective assistance claim on direct appeal. *Id.* General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review. *Id.* To show prejudice on a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*

Chilen alleges that he received ineffective assistance of counsel because his trial attorney failed to object to or request redaction of portions of the recorded police interview concerning his Fifth Amendment assertions with respect to the driving during revocation charge, and failed to move for a mistrial when the jury heard this evidence. Chilen also alleges that his counsel was ineffective for failing to move to suppress his statement prior to trial and to suppress evidence gained from the search of the trailer. Chilen further alleges that he received ineffective assistance of counsel because his attorney was not fully prepared for trial and should have requested a continuance.

These assertions all touch on matters of trial strategy. Trial counsel is afforded due deference to formulate trial strategy and tactics. *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013). When reviewing a claim of ineffective assistance of counsel, an appellate court will not second-guess reasonable strategic decisions by counsel. *Id.* There is no evidence in the record to allow us to determine whether Chilen's trial counsel consciously chose the above-referenced actions as part of his trial strategy. Because the record is insufficient to adequately review these claims of ineffective assistance of trial counsel, we do not address these claims on direct appeal.

Finally, Chilen alleges that his trial counsel was ineffective for failing to adequately prepare him for his decision on whether to testify and for his testimony. An accused may waive the privilege against self-incrimination or the right to remain silent, provided the waiver is made voluntarily, knowingly, and intelligently. *State v. Pettit*, 227 Neb. 218, 417 N.W.2d 3 (1987). The Nebraska Supreme Court has held that defense counsel's advice to waive the right to testify can present a valid claim of ineffective assistance in two instances: if the defendant shows that

counsel interfered with his or her freedom to decide to testify or if counsel's tactical advice to waive the right was unreasonable. *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011).

The record shows that Chilen was advised by the district court multiple times of his right to remain silent and that if he testified, he would waive that right. The record also shows that Chilen had several opportunities to discuss with his attorney the issue of whether he would testify and that Chilen understood his rights and the consequences of choosing to testify. However, the record does not reveal what the nature of the discussions between Chilen and his trial counsel were regarding Chilen's decision to testify and waiver of his right to remain silent. Thus, the record is insufficient to determine whether any advice given by counsel interfered with Chilen's freedom to decide to testify or if any advice given was unreasonable. Likewise, the record is insufficient to address Chilen's claim that counsel did not adequately prepare him for his testimony. Therefore, we do not address this claim of ineffective assistance of counsel.

By finding the record insufficient to address Chilen's claims, we make no comment on whether his allegations of ineffective assistance would be sufficient to require an evidentiary hearing in the context of a postconviction action. We simply decline to reach Chilen's claims on direct appeal because the record is insufficient to do so.

### 5. EXCESSIVE SENTENCES

Chilen asserts that the district court erred by imposing excessive sentences. Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Carngbe*, 288 Neb. 347, 847 N.W.2d 302 (2014). When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *Id.*

Chilen was convicted of first degree assault, which is a Class II felony, and driving during revocation, which is a Class IV felony. See, § 28-308; § 60-6,197.06. Class II felonies are punishable by 1 to 50 years' imprisonment. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2012). Class IV felonies are punishable by 0 to 5 years' imprisonment, a $10,000 fine, or both. *Id.* The district court sentenced Chilen to 10 to 15 years' imprisonment for the assault conviction and to a consecutive sentence of 1 to 3 years' imprisonment for the driving during revocation conviction. Accordingly, Chilen's sentences did not exceed the statutory limits.

A review of the presentence investigation report and the district court's comments during the sentencing hearing show no abuse of discretion. The court clearly considered the relevant factors, and the presentence investigation report shows that Chilen has a somewhat lengthy criminal history, consisting of many traffic-related offenses but also including convictions for third degree assault of an officer, disturbing the peace, and refusing to comply with the order of a police officer. The level of service/case management inventory administered by the probation office assessed Chilen as a very high risk to reoffend. Chilen argues that the assault was motivated in part by incidents that occurred when he and Card were growing up together, but the assault on Card occurred many years after these incidents. The record shows that Chilen was

angered by Card's behavior and actions on April 27 and 28, 2013, and beat him severely, leading to injuries including multiple bone fractures. The court did not abuse its discretion in sentencing Chilen. This assignment of error is without merit.

## VI. CONCLUSION

The district court did not abuse its discretion with regard to the motion to sever the charges, the motion for mistrial, the motion for directed verdict on the assault charge, and the sentences imposed. The record on appeal is insufficient to review Chilen's allegations of ineffective assistance of counsel.

AFFIRMED.